ARTHUR LEE ET AL., Respondents, v. THOMAS F. TURNER ET AL., Appellants.

15 205
45 577

February 12, 1884.

1. ASSIGNMENT OF NEGOTIABLE PAPER — MISTAKE. — The assignment of a dishonored note secured by deed of trust does not carry with it the collateral, when both parties erroneously believe that the deed had been foreclosed and have an understanding inconsistent with such an assignment.

2. —— The transferee of negotiable paper transferred after maturity, acquires only such title as the transferrer had.

3. NOTICE DEFINED. — Notice signifies the means of knowledge of which a person neglects or refuses to avail himself.

APPEAL from the St. Louis Circuit Court, BARCLAY, J. *Reversed and remanded.*

THOS. T. GANTT, for the appellants.

LOUIS GOTTSCHALK, for the respondent Roemheld.

BAKEWELL, J., delivered the opinion of the court.

The plaintiffs were trustees in a deed of trust made to secure the payment of certain promissory notes. The net proceeds of the sale of the property on foreclosure, in the hands of the trustees, were claimed by three different persons: Thomas T. Turner, the original payee of the notes; Brainard M. Million, to whom the principal note was delivered, after maturity, by Turner; and William Roemheld, to whom this note was delivered by Million as collateral security for a loan. These persons were made defendants, and were required to interplead for the fund. Each defendant, in a separate answer, sets up the grounds upon which he claims the proceeds of the sale. On hearing, the court decreed that the interplea of Million be dismissed, and that out of the money paid into court by plaintiffs, $3,000, with interest from August 22, 1881, at ten per cent, be paid to Roemheld, who is required to surrender into

court, for such disposition as the court may direct, the principal note delivered to him as collateral, and also Million's note to him for the money lent by him to Million; and that the remainder be paid to Turner, and that Turner and Roemheld pay the costs. From this decree Turner appeals.

It appears from the evidence that on February 22, 1876, August Rohn and wife executed to plaintiffs a deed for a lot of ground in St. Louis to secure seven promissory notes of same date, all made by Rohn to the order of Turner, as trustee of Rebecca Briggs, all bearing interest after maturity at ten per cent; the principal note was for $9,000, payable in three years; the other notes were interest notes for $450 each, payable at intervals of six months. The three first maturing interest notes were paid. The other notes were not paid, and the taxes for 1878 were also not paid. The deed contained a covenant that Rohn should pay all taxes, and for default in this respect, or in payment of any of the notes, the trustees were empowered to sell on thirty days' notice by advertisement. Rohn died in 1878. In March, 1879, the trustees, at the request of the holder of the notes, advertised the property for sale. This advertisement was not inserted for thirty days, but for twenty days only, owing to a mistake of the trustees. A sale was, however, made under this defective notice, and the property was knocked down to Turner, the holder of the notes, at $6,000. The trustees applied the net proceeds of this sale first to the interest notes, which were thereby extinguished and cancelled, and then to the principal note, on which a credit of $4,633.08 was indorsed. The trustees then made a deed to Turner for the property with the usual recitals. Turner took possession without objection; the tenants attorned to him; he paid delinquent taxes and remained in peaceful possession, believing that the foreclosure was valid, until July 1, 1881, when an offer was made to him to purchase the property for $9,000. Turner ac-

cepted the proposal; but, when the would-be purchaser examined the title, he discovered the defect in the proceedings to foreclose. There seemed to be nothing for it but to sell again. This was done, and the property at the second sale brought $12,000. This sale was made in April, 1882. Meanwhile, however, Turner, at the suggestion of Million, had taken steps to collect the remainder which, after the first sale, appeared to be due on the principal note. The estate of Rohn was insolvent, but Million believed himself to have the means of showing that certain conveyances of Rohn were made in fraud of creditors. He communicated his suspicions to the Lees, and proposed to begin proceedings at his own cost to set aside these conveyances, if Turner would give him half of what might thus be realized out of his supposed claim against Rohn's estate. Turner agreed to this, and, to further the arrangement, delivered to Million the Rohn note for $9,000. At the time the note was delivered to Million, it had the following indorsement : " Pay BrainardM. Million, or order, without recourse on me. Thos. T. Turner, trustee of Rebecca Briggs." " March 10, 1879. Credit by proceeds of trustee's sale, this day, $4,633.08. Arthur Lee, John F. Lee, trustees." At the same time, on the 23d of April, 1879, Turner and Million entered into a written agreement. This agreement sets forth that Turner has assigned and delivered to Million by indorsement, without recourse, the note of Rohn of February 23, 1876, on which was due $4,400.67 on March 10, 1879 ; which note is assigned by Turner and accepted by Million in trust; that Million shall proceed to collect the note with all dispatch and retain one-half of the proceeds so collected, whether by suit or otherwise, in payment for his services, and pay the other half to Turner so soon as collected. Million to pay all costs of the suits or other proceedings instituted for the collection of the note, and to save Turner harmless therefrom and from all damages. If, at the end of eight years, nothing shall have been collected

by Million under the agreement, he is to return the note to Turner. Million having obtained the note under this agreement, proceeded to prove up several demands against Rohn's estate in his own name in the probate court. These demands were allowed and placed in the fifth class, on June 14, 1879; they amounted altogether to over $12,000, and included the balance appearing due on the note of Rohn to Turner, according to the credits on the back of that note. There was an appeal taken from these judgments on the note, which is pending in the supreme court. Million also began proceedings in the circuit court to set aside Rohn's conveyances. In all these proceedings Million employed counsel, and these facts were known to the Lees and to Turner. About the 1st of August, 1881, the mistake in the first advertisement having been discovered, the Lees, as trustees, inserted in the *Post-Dispatch*, a St. Louis daily paper, another advertisement of sale under the Rohn deed of trust. But, on the 31st of August, Rohn's administrator began proceedings to enjoin this sale, in consequence of which it was delayed until the next spring. Whilst this advertisement was in the St. Louis paper, Million applied to Mr. Uhlman, an examiner of titles in St. Louis, for a loan upon the Rohn note. Uhlman tried to negotiate this in bank. But the banks declined the paper, as not being such paper as banks discount. Roemheld, who is a man in prosperous circumstances, and who frequently lent money upon real estate, applied to Mr. Uhlman about the investment of some money, as he was in the habit of doing. Thus Million and Roemheld were brought together. Roemheld looked at the real estate described in the Rohn deed of trust, and told Uhlman that he considered it sufficient security for a loan of $3,000, and directed him to examine the title. Roemheld knew nothing about Million, and told Uhlman that he looked to him to make the thing secure. Uhlman examined the title, and found it to be perfect in all respects, and gave a certificate to Roemheld that the title

was vested in Rohn's legal representatives ; that the sale by trustees on March 10, 1879, was void, and that the deed of trust securing the Rohn notes of February 22, 1876, was a first lien. Then, on August 22, 1881, Uhlman obtained a written opinion from an attorney, based upon his abstract, to the effect that the foreclosure of March 10, 1879, was void, the deed of trust of February 22, 1876, a first lien, and in full force, and that the indorsement of Turner vested in Million the title to the note of Rohn, and to the deed of trust securing it. Roemheld was informed of the first sale. No inquiries whatever were made by Uhlman or Roemheld of Turner, the Lees, or Million, as to Million's title to the note, nor as to the interest notes secured by the same deed of trust. Million was asked by Uhlman for the deed of trust, but furnished only a certified copy of it, and nothing was said about the original. Uhlman did not see the note of Million until the transaction between Roemheld and Million was about to be closed. The note had on it, at that time, the indorsements mentioned above, and also an allowance in writing of the demand against Rohn's estate for $4,485.69 on June 14th, signed by the judge of probate. Million then gave to Roemheld the note of Million at one year for $3,000, dated the 22d of August, 1881, a certified copy of the deed of trust, and the Rohn note, which Million especially indorsed to Roemheld. At the same time, Roemheld gave to Million $3,000 in cash and checks, and an agreement was signed by Roemheld and Million setting forth that the Rohn note was pledged by Million to Roemheld, and held by the latter as collateral security for the loan of $3,000, evidenced by Million's note. All this was done on the day of the date of that note. It was admitted at the trial that Million is insolvent ; that his note to Roemheld is unpaid ; and that Turner was in peaceble possession of the premises in question from March 10, 1879, to the date of the second sale in April, 1882. Roemheld was in possession of the Rohn note at the date of the trial.

On this state of facts, Roemheld claimed that he is entitled to so much of the fund in court as will pay the Rohn note, which he claims to hold as collateral, together with interest. Million says that he is the legal and beneficial owner of the Rohn note ; that it is held by Roemheld as collateral to secure Million's indebtedness to Roemheld for $3,000 and interest, and asks that the fund in court be paid to the holder and owner of the Rohn note ; and Turner claims, that he is entitled to so much of the fund in court as will pay in full all the Rohn notes, that is the principal note of $9,000 and interest, and the unpaid interest notes.

We need not inquire whether, upon this state of facts, Million is entitled to recover from Turner any expenses to which he may have been put, or compensation for his trouble and loss of time in endeavoring to enforce the recovery from the estate of Rohn of any supposed balance due upon the note after the credit had been made upon it by mistake. No such claim against Turner is, or could be, set up in the present proceeding.

The first inquiry will be as to what Million took by the assignment of Turner. If the assignment had been made before maturity for value, in the absence of any express agreement between the parties to the contrary, the assignment of the note would have carried with it the collateral. *Goodfellow* v. *Stillwell*, 73 Mo. 17 ; *Logan* v. *Smith*, 62 Mo. 455. But in the present case the note was assigned after it was dishonored ; and the minds of the assignor and assignee met upon this — not that the collateral should go with the note, but that the collateral was exhausted, that it had ceased to exist ; that having been applied to, and swallowed up, so to speak, by the note, and the note being still unsatisfied, recourse should be had to the general assets of the maker. Million was to discover such assets if he could, and to make them available if he could, toward the payment of what yet remained due upon the note after the sale of the collateral and the application which had been already made

of the proceeds of this sale. This was the agreement between Million and Turner. It was reduced to writing; there can be no mistake about it. If Million knew at the time of the transfer to him that the sale of the collateral was void, and the credit on the note void, and the deed of trust securing the note still in force, or if he had at once discovered this and had then claimed, under this assignment and agreement, that he owned the note and collateral, or half the note and collateral, and, in virtue of his possession of the note, had directed the trustees to foreclose and to pay the proceeds to him, does any one doubt that he would have been guilty of an attempt to perpetrate a monstrous fraud on Turner, or imagine that courts are so blind and the administration of justice so ineffective, that he would have been enabled, as against Turner, to hold the proceeds arising from a foreclosure? No one thinks so whose thoughts on such a matter are deserving of any respect. The collateral was not assigned, because the parties to the transfer of the note intended not to assign the collateral, and did not mention the collateral because they both labored under an honest mistaken belief that the collateral had been sold, and that the credit on the back of the note represented the net proceeds of the sale.

Million, certainly, took no assignment of the deed of trust. He took none at law, because no legal assignment of that instrument was made. He took none in equity by the assignment of the debt secured, by reason of the equitable considerations just mentioned above.

Is Roemheld, as to this, in any better condition than his assignor? The general rule is, that the transferee of negotiable paper to whom it is transferred after maturity, acquires only the actual right and title of the transferrer. Not only was the Rohn paper overdue when Roemheld bought it, but it was stamped with almost every note which could define dishonor. It was long past due; it was assigned

without recourse; it was credited on the back with the proceeds of the sale of a collateral given to secure it; it showed upon its back that, for the unpaid balance, an allowance had been made in the probate court against the estate of the maker, long after maturity. Uhlman, the agent of Roemheld knew, and Roemheld himself knew, that a sale held to be void had been made of the collateral securing the note; and, at the very time that Roemheld was negotiating the transaction by which he took this note as collateral for another note which was to run for a year, the collateral by which the Rohn note was secured was advertised for sale at the instance of some one claiming to own the Rohn note. If this advertisement was made at the instance of Million, how absurd to make to Million a loan as an investment for one year upon the security of a collateral which was about to be sold. If Million owned the Rohn note, and needed money, why should he not wait a week, until the deed of trust was foreclosed? No such question was put to Million, either by Roemheld or by Uhlman, who acted for Roemheld in the matter. He was asked nothing about his title to the note, though the note was dishonored; nothing about the first attempted, or the second imminent, foreclosure; nothing as to the deed of trust, of which he could not produce the original; nothing as to the interest notes secured by that deed, which, if unpaid, were a first lien, which, if they were unpaid, amounted to about $3,000. There is an old proverb as to a species of blindness said to be worse than that of those who can not see. Of the transaction between Turner and Million, neither Roemheld nor Uhlman had any actual knowledge, nor had the fox in the fable any actual knowledge that misfortune attended the beasts who went into the lion's den; but he saw that all the foot-marks were those of animals going to the cave, and that none were turned the other way. If he needed further information he probably made further inquiry. At any rate, the pru-

dent beast did not go into the cave himself, for the reason put into his mouth by the great poet of common sense : —

*Quia me vestigia terrent*
*Omnia te adversum spectantia, nulla retrorsum.*

The least inquiry, either of Turner or of Million, must have elicited the fact that Million had no right to pledge the Rohn note in such a way as to carry with it the deed of trust securing it. Even Million must have disclosed this ; for it was obvious to inquire, why, if he owned the Rohn note, any one else was directing the trustees to foreclose, or why, if he was directing the foreclosure advertised for September 2d, he desired to borrow $3,000 for one year, on the 18th of August, on the security of a note which must, if well secured, be paid in two weeks. It may be said that proceedings were already on foot to enjoin this foreclosure ; but an inquiry into these proceedings would have given Uhlman or Roemheld the actual knowledge for the absence of which Roemheld assumes the attitude of an innocent purchaser without notice. It is well settled that every one is conclusively presumed to know those things which he might have known if he chose to ask a question that it was his duty, in ordinary prudence, to ask. Notice means the means of knowledge of which a person wilfully neglects or refuses to take advantage. We are of opinion, that taking this note after maturity and without inquiry, Roemheld stands in no better position than the transferrer ; and that, as the deed of trust did not pass with the note to Million, neither can it be looked to by Roemheld for satisfaction of the note which he took from Million.

But we are cited to the doctrine that, where, of two innocent persons, one must sustain a loss occasioned by the fraud of a third, it must fall upon the one who put it in the power of the third one to commit the fraud. Of this doctrine, there can be no doubt. It is said that this doctrine is applied by the supreme court in the case of the *Interna-*

*tional Bank* v. *The German Bank* (71 Mo. 183), in a manner which makes it impossible to throw upon Roemheld a loss into which he was betrayed by the mistake and imprudence of Turner, as shown by the evidence in the present case. We do not think that an examination of that case shows any application of the doctrine in question to the facts before us. That was not a case of paper dishonored; but of a certificate of deposit not yet due, as to which the court held, that, though it was not strictly negotiable, yet the person to whom it is issued, if he enabled any one to appear as its owner, was bound by the disposition that such person might make of it. Here the paper was suspicious upon its face; it gave warning that, if indorsed after maturity, all persons taking it put themselves merely in the shoes of the transferrer. The whole agreement between Turner and Million could not be written out on the back of the note; but Turner did write that he assigned without recourse; and, what would have been written on the back of the note had there been room, and what was written on a separate paper for want of room, was, in effect, that the remainder of the note unpaid after sale of a specific security, with the proceeds of which it was credited, were assigned; that Million was to try to collect this remainder and to pay Turner half of all he thus collected. Nothing is said about the transfer of the collateral. The indorsement on the note implicitly shows, what might have been unfolded on inquiry by any one interested, that, in the eyes of transferrer and transferee, the collateral was already exhausted and applied. The deed of trust was not assigned, and in order to maintain his position here, Roemheld is obliged to apply the rule that the assignment of a note before maturity carries with it the collateral to every transferee before maturity, to the case of the transfer of dishonored mercantile paper, made by one who took the paper after dishonor, with the distinct understanding that no collateral went with it, to another who took it with what amounts to notice that

such was the understanding between the former indorser and indorsee at the time of the first transfer.

We are of opinion that the decree herein should be reversed and the cause remanded. It is so ordered. All the judges concur.